**Opinion issued June 27, 2019**



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-19-00022-CV

———————————

## IN THE INTEREST OF E.C.A. AND A.A.G., MINOR CHILDREN

---

### On Appeal from the 314th District Court
### Harris County, Texas
### Trial Court Case No. 2016-01847J

---

### MEMORANDUM OPINION

In this accelerated appeal, appellant, J.I.A. ("Mother"), challenges the trial court's decree terminating her parental rights to her minor children, E.C.A. and A.A.G. In one issue, Mother argues that the evidence is legally and factually insufficient to support the finding that termination of her parental rights was in the best interest of her children under Texas Family Code section 161.001(b)(2).

We affirm.

## Background

In 2017, the trial court terminated Mother's parental rights to her children, E.C.A. and A.A.G. Mother appealed to this Court, and, on December 28, 2017, we held that the evidence supported the predicate finding, but the evidence was factually insufficient to support the finding that termination of Mother's parental rights was in the best interests of her children. *See In the Interest of E.C.A. and A.A.G.*, No. 01-17-00623-CV, 2017 WL 6759198, at *13 (Tex. App.—Houston [1st Dist.] Dec. 28, 2017, no pet.) (mem. op.). We reversed the portion of the judgment that terminated Mother's parental rights, affirmed the remainder of the judgment, and remanded the case for a new trial. *See id.* at *14.

After remand, the Department of Family and Protective Services ("DFPS") sought again to terminate Mother's parental rights. At the second trial, the trial court admitted DFPS's removal affidavit which stated,

> On 5/23/2015, [DFPS] received a referral involving [Mother] and her two sons, [A.G.] and [E.C.A.]. The referral indicated a concern that the children have been physically neglected by the mother. It was reported that the children appeared "pale and weak." The children had red, peeling rashes upon their arms and legs. Both children had diaper rashes because [Mother] left them in the same diapers all day. The rashes upon the arms and legs of the children were suspected to have been caused by bed bugs. The children were not believed to be showing visible signs of malnutrition and or starvation, and have no apparent injuries. It is reported that the mother only feeds the children milk and fruit punch and sometimes the milk is old. The home was unclean, it

2

smells like urine, and the couch is allegedly soaked in urine. The children walked around the home barefoot, and had black feet. The mother left blunts rolled from synthetic marijuana within reach of the children. The mother was believed to be under the influence of synthetic marijuana while caring for the children, but it is unknown if she used [it] in the presence of the children.

**Second Trial—October 9, 2018**

At the retrial, four witnesses testified: Brittany Johnson, the CPS caseworker; Sara Strom, the CASA Volunteer assigned by Child Advocates; Bruce Jefferies, an employee of National Screening Center; and Mother.

*Brittany Johnson's Testimony*

Johnson testified that the case against Mother started after they received a call on May 23, 2015, alleging neglectful supervision, drug usage, and neglectful care of the children. Johnson agreed that the call indicated the home was dirty and smelled of urine, the children had diaper rash, the children were walking around barefoot with black feet, and Mother had blunts in her home. Johnson agreed that when DFPS interviewed Mother, she admitted to synthetic marijuana use. After the children were put in a parent-child safety placement, DFPS asked Mother to get drug tested but Mother would not go. Johnson recalled that one child was placed with the paternal grandparents, but after discovering that the paternal grandparents allowed Mother and Father[1] to live in the home when they were not supposed to and because

---

[1] Father's parental rights were also terminated in 2017.

they allowed some domestic violence between the two parents, DFPS removed the child and placed the child with the maternal grandparent. Johnson testified that because Mother was not making progress on family reunification, DFPS filed this case. Johnson agreed that Mother tested positive for drugs on May 17, 2016. Johnson also agreed that Mother did not complete her family service plan when the case was tried the first time because "[s]he had failed to complete individual counseling and to maintain visiting with the children per our family plan of service for her remaining contact."

Johnson testified that the children have been in the current foster home since January 2018, the adoptive foster placement is meeting all of the children's physical and emotional needs, and the new foster home is willing to adopt all of the children.[2] Johnson testified that it is in the children's best interest to stay in the placement that they are in because it is "safe, it's stable and they are free of any harm of physical abuse."

Johnson has become aware that Mother is having contact with one of the child's fathers whose parental rights were terminated after the first trial in 2017. She agreed that Father has a long criminal history and a retaliation charge against Mother

---

[2]     Mother has a third child that is not the subject of this appeal. *See In the Interest of A.R.G.*, No. 14-18-00952-CV, 2019 WL 1716262 (Tex. App.—Houston [14th Dist.] April 18, 2019, no pet.) (mem. op.). We note that our sister court of appeals affirmed the trial court's termination of Mother's parental rights as to this third child. *See id.*

4

due to hitting Mother several times on September 21, 2018. Johnson agreed that Mother bringing Father back into her life when he has no interest in the children is a "major concern." Johnson identified a picture from Facebook that depicted Mother and Father sharing a kiss in September 2018. Johnson testified that the picture occurred 10 days before Father picked up a "retaliation charge" for hitting Mother. Johnson agreed that Father appearing in social media with Mother in the last month shows that he is still hanging around and that he is a danger to the children and to the Mother. Johnson agreed that Mother has bad judgment and an inability to properly protect the children by letting Father back into her life after assaulting her again.

Johnson further agreed that after the first trial, she required Mother to take a psychosocial evaluation, but that Mother had not done it yet because Mother

> [R]everted back to her original ways, by saying she wasn't getting the phone calls or the messages that were left for her to schedule the appointments. So I took it upon myself to contact them and make—and give her the number as well to contact them and tell them both to follow up with me. While I did that, she was able to schedule an appointment, which was September the 20th, and that's when the issue with the psychosocial and the substance abuse assessment happens where it was ended.

Johnson agreed that Mother was required to complete a drug and alcohol evaluation too but that it ended because Mother "was not truthful about her past or current drug abuse."

5

On cross-examination, Johnson admitted that since the last trial, Mother completed the family service plan. Johnson also testified that DFPS put Mother on another parenting plan that started in August 2018. When asked if Mother had been cooperating and doing what was requested, Johnson answered, "Somewhat, yes." Johnson stated that Mother had not completed her psychosocial evaluation and that her drug assessment was started but it ended in the middle of the session because Mother was being untruthful. Johnson agreed that Mother asked for visits with her children and that Mother has had visits with her children, twice a month. Mother had arrived to all of the visits except one and all of the visits had gone well except for one visit where Mother was not able to control the children and Mother "wanted assistance with parenting. She wanted someone to step in and say—and tell the boys to, you know, calm down or redirect the children instead of her doing so." Johnson agreed that the children were acting typical of young boys when they were wrestling, running around, and jumping and that Mother was trying to "recuperate the children" by asking for visitation and to be placed back on a parenting plan. Johnson recalled that Mother was supposed to have supervised visitation but that she had unsupervised visitation from January to May 2017. During these times of unsupervised visitation, Johnson agreed that the children were not abused.

Johnson also recalled a previous incident that occurred before the termination. Johnson testified that Mother got into a physical altercation with a 15-year-old

pregnant teenager, who was apparently Father's girlfriend. Johnson testified that Mother was charged but that she only received a citation for the altercation. Johnson agreed that Mother was pregnant when she tested positive for cocaine in May 2016, but after her daughter was born and Mother was tested again, she did not test positive.

Johnson stated that she has seen Mother's home on two occasions and she described it as clean. Johnson agreed that Mother followed the recommendation of DFPS when she got an apartment by herself and that she has kept gainful employment at a tax preparation business. Johnson agreed that Mother's work and home situation is stable.

Johnson agreed that Father has not caused any danger to the children, but he has caused danger to Mother. Johnson explained that she did not think it was in the best interest of the children to have Mother in their lives because "she has not shown the ability to parent." Johnson disagreed that Mother was working and doing everything that has been requested by DFPS because Mother did not separate from Father even though she agreed to do so.

*Sara Strom's Testimony*

Sara Strom testified that she is familiar with Mother and the children because she has been on the case since the beginning. Strom believes the current placement is "stable, good for the children and could bring [an] excellent future for them." Strom described Mother's current home as a "one room apartment with full bedroom." She did not observe Father at the apartment but she said CPS did. Strom testified that Child Advocates believes that Mother's parental rights should be terminated because "the mother has shown not good—to keep ahead of her own interest. And she had be[en] in touch with the father. She's talking about the father as the man that she loves. And that the father wants to be the father of her children." Strom agreed that Mother has allowed Father back into her life.

On cross-examination, Strom agreed that Mother's home was decent. When asked how Father harmed the children, Strom replied that he has harmed the children by being in jail and he is not a part of the children's life, he has never paid child support, and he is abusing the children's Mother.

*Bruce Jefferies's Testimony*

Jefferies testified that Mother tested positive for cocaine in May 2016 and tested positive a second time on July 31, 2018 for cocaine and exposure to marijuana. Jefferies explained that Mother's testing revealed that she was "getting closer to a level that might indicate weekend usage." Jefferies also explained that her marijuana

testing indicated "that she was around someone quite often, cause it's a very high level of exposure. Her hair was saturated with marijuana smoke."

On cross-examination, Jefferies confirmed that Mother did not consume marijuana but she was exposed to it. He also clarified that weekend usage means a once-a-week user. Jefferies also admitted that they had a test taken on January 11 and the result was negative. Jefferies agreed that Mother did not test positive [for cocaine] for about two years and one month before the positive result on July 31, 2018. Jefferies admitted that Mother had 41 negative test results.

*Mother's Testimony*

Mother testified that she is 22 and working as a secretary. She disagreed that she had used "kush," marijuana, or cocaine in the past. Mother did not know why she got a positive drug test result on May 17, 2016 but "maybe because I was around . . . negative people." She agreed that Father used cocaine three or four times in front of her. Mother testified that when Father hit her on September 21, 2018, Father was under the influence of drugs at that point in time. She recalled that Father was on drugs in July 2018 and that she kept him around because she thought he was going to change and be a part of the children's lives. Mother agreed that she knew Father was using drugs back in June 2016, and she understood that Father relinquished his parental rights, meaning he did not want to have anything to do with

9

his child. Mother testified that she wanted Father back in her life because he said he was going to change, support her, and get their kids back.

Mother admitted that she let the Father back into her life after his rights were terminated and despite her past experience with him. Mother agreed that Father beat her up again and that he got her involved with drugs again. Mother admitted that after Father went to jail for hitting Mother, she then took her kids to jail to visit him during the time when she was not supposed to have unsupervised visitation. Mother testified that she would call the police if Father came back.

Mother testified that when CPS entered her life, she did not cooperate because she was scared they were going to remove the kids. Mother disagreed that a caseworker recently visited her house and observed a blunt on the kitchen counter. Mother admitted that while she was trying to get her children back, Father used marijuana in the house, but that she would tell him to get out.

On direct examination, Mother agreed that CPS became involved in 2015 because the children had dirty diapers and insect bites. Mother said she has now learned from the parenting plan on how to care for her children. She explained that the one time that she asked for help with parenting was because the children no longer see her as the disciplinarian. Mother agreed that she should have a support system and that her mother is willing to be a support system for her. Mother testified that she and Father have never harmed or abused the children, she does not consume

10

drugs, and would not take drugs in the future. Mother testified that she has been working for nearly two years, she got an apartment so she could get her children back, and she sees her children every two weeks. Mother explained that she missed one scheduled visitation because she did not write the appointment down. She testified that she was doing another parenting plan because she wanted to get her children back. She testified that she allowed Father to return because he planned to change, he had a job, and she wanted to give him a chance as a family.

She also testified that Father would never change and that she was actively helping prosecutors to prosecute Father for his retaliation charge. Mother testified that she called the police on Father in September 2018 because she was done with him. Mother agreed that she was asking the Court to give her the time to complete the family service plan and to allow her to work towards reunification with her children and that remaining in their lives is in their best interests.

*Trial Court Disposition*

DFPS asked to terminate Mother's parental rights based on subsections (D), (E), (O), and (M). *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), (M). DFPS further stated that (D) and (E) were satisfied because of a combination of failing both drug tests and allowing Father to be with her and around the children. Because Mother admitted that she has not completed her family service plan, DFPS said that would trigger subsection (O). DFPS argued that the subsection (M) ground also

supports termination because of the prior termination case "that's no longer appealing." During closing arguments, all of the parties, except Mother, were unanimous in recommending that the trial court terminate Mother's parental rights to E.C.A. and A.A.G.

On December 18, 2018, the trial court rendered a decree terminating Mother's parental rights pursuant to Family Code section 161.001(b)(1)(D), (E), (O), and (M). Mother appeals again, arguing that the evidence supporting the finding that termination is in the children's best interest is legally and factually insufficient.

**Best Interest of the Children**

**A.     Standard of Review**

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Therefore, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). However, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that a parent may forfeit his or her parental rights

12

by their acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

In a case to terminate parental rights by the Department under section 161.001 of the Family Code, DFPS must establish, by clear-and-convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Clear-and-convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *A.V.*, 113 S.W.3d at 362. *But see In the Interest of N.G., A Child*, No. 18-0508, 2019 WL 2147263, at *6–10 (Tex. May 17, 2019) (holding that reviewing court must review (D) or (E) findings if raised on appeal).

In a legal-sufficiency review in a parental-rights-termination case, the appellate court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable

13

factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If, after conducting a legal sufficiency review of the record, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *Id.*

In conducting a factual-sufficiency review in a parental-rights-termination case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (quoting *J.F.C.*, 96 S.W.3d at 266).

As a matter of public policy, "the best interest of a child is usually served by maintaining the parent-child relationship." *J.F.C.*, 96 S.W.3d at 294. Despite this important relationship, the Texas Supreme Court has held that "protection of the

14

child is paramount" and "the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *A.V.*, 113 S.W.3d at 361.

Appellate courts examine the entire record to decide what is in the best interest of the child. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In assessing whether termination is in a child's best interest, the courts are guided by the non-exclusive list of factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id.* "[T]he State need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence was undisputed that the parental relationship endangered the safety of the child.'" *In re C.T.E.*, 95 S.W.3d 462, 466

15

(Tex. App.—Houston [1st Dist.] 2002, pet. denied) (quoting *In re C.H.*, 89 S.W.3d

17, 27 (Tex. 2002)).

The Texas Family Code, section 263.307, also provides a list of relevant

considerations in determining the best interests of the child:

(a) In considering the factors established by this section, the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(b) The following factors should be considered by the court and the department in determining whether the child's parents are willing and able to provide the child with a safe environment:

 (1) the child's age and physical and mental vulnerabilities;

 (2) the frequency and nature of out-of-home placements;

 (3) the magnitude, frequency, and circumstances of the harm to the child;

 (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department;

 (5) whether the child is fearful of living in or returning to the child's home;

 (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

16

(7)     whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8)     whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9)     whether the perpetrator of the harm to the child is identified;

(10)    the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11)    the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12)    whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

        (A) minimally adequate health and nutritional care;

        (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

        (C) guidance and supervision consistent with the child's safety;

        (D) a safe physical home environment;

        (D) protection from repeated exposure to violence even though the violence may not be directed at the child; and

        (E) an understanding of the child's needs and capabilities; and

17

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

....

TEX. FAM. CODE § 263.307.

Termination of the parent-child relationship is not justified when the evidence shows that a parent's failure to provide a more desirable degree of care or support of the child is due solely to misfortune or the lack of intelligence or training, and not to indifference or malice. *Clark v. Dearen*, 715 S.W.2d 364, 367 (Tex. App.—Houston [1st Dist.] 1986, no writ).

For purposes of determining legal sufficiency, we consider those factors that support the finding that termination was in the child's best interest. *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 243 (Tex. App.—Houston [1st Dist.] 2006, no pet.). If the evidence is legally sufficient, we then balance the factors presented in the legal sufficiency argument against the evidence that undercuts any finding that termination is justified under the statute. *C.T.E.*, 95 S.W.3d at 467. We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. If, after considering the entire record, the disputed evidence that weighs against termination is so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination was justified, then the evidence is factually insufficient to support termination. *Id.* A court of appeals should detail in its opinion

18

why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of termination. *Id*. at 266–67.

## B. Analysis—Legal and Factual Sufficiency

*Desires of the Children*

At the time of the second trial, the children were six and four years old. No direct evidence indicated whether the children desired to remain with Mother. Mother testified that she has been seeing the children every two weeks and that the children are happy to see her. The evidence also showed that the children are getting all of their needs met by their current placement and that the foster parents want to adopt the children. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (stating that when children are too young to express their desires, fact finder may consider that "children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent").

*Emotional and Physical Needs of and Danger to the Children*

DFPS presented evidence that Mother failed a drug test in 2016 and another drug test in 2018, both while she participated in parental termination proceedings and was in danger of losing her children. In addition, DFPS presented evidence that Mother continued to allow Father into her life, despite Father's long criminal history, drug use, propensity to commit domestic violence, and loss of his parental rights. While Mother testified that she is done with Father, the trial court could have

19

believed that the children's future with Mother could involve a life of parental domestic violence and criminal activity. *See In the Interest of A.R.G.*, 2019 WL 1716262, at *9 (stating that trial court was free to believe that child's future with Mother could involve life of parental domestic violence and criminal activity). The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). The trial court reasonably could have considered that the Father's repeated acts of violence and Mother's use of drugs would continue in the future. *See Walker v. DFPS*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (stating that "danger to a child need not be established as an independent proposition and may be inferred from parental misconduct even if the conduct is not directed at the child and the child suffers no actual injury").

*Parental Abilities of the Mother*

The evidence showed that although Mother did not complete her first parenting plan, she was able to complete the plan by the time of the second trial and she was currently working on a second plan. Mother testified that the parenting plan provided her with help in caring for her children, a support system would help her, and her mother could serve as that support system. Despite violating a court order,

Mother had taken the children for unsupervised visitation, during which the children apparently did well.

However, the evidence also revealed that Mother tested positive a second time for cocaine in July 2018, and Mother has allowed Father, who has a long criminal history, drug use, and a propensity to commit domestic violence, back into her life. The evidence showed that Mother lacked good judgment and would likely have the children in a dangerous environment.

*Programs Available to the Mother*

The evidence showed that although Mother did not complete her service plan before the first trial, she had completed it by the second trial and she started working on a second service plan. The evidence also showed that despite DFPS's education programs for Mother, Mother showed disregard for the plans as demonstrated by her failed drug test and willingness to let Father back in her life.

*Plans for the Children*

Mother did not testify as to her plans for the children other than that she has maintained employment, has an apartment, and wants to get her children back. The evidence also showed that Mother has allowed Father back into her life, which "threatens to destabilize the life Mother envisions for herself and her children." *In the Interest of A.R.G.*, 2019 WL 1716262, at *10.

The evidence showed that DFPS wanted the children to stay in the current placement where they were thriving and that the foster parents wanted to adopt all of Mother's children.

*Mother's Acts or Omissions*

The evidence shows that some of Mother's acts and omissions occurred before DFPS became involved with the family. Specifically, Mother's house was dirty and smelled of urine, the children were dirty, had bed bugs and diaper rash, and appeared "weak and pale." Mother used synthetic marijuana, which she left in the children's reach.

More concerning, however, is that Mother failed a second drug test in 2018 for cocaine after we issued our opinion reversing and remanding for a new trial in 2017. Mother also took her children to visit Father in jail, despite his criminal history, drug use, and propensity to commit domestic violence. Further evidence indicates that Mother allowed Father back into her life. Although Mother claims that she is done with Father, the trial court could have disbelieved this testimony.

*Excuses for Mother's Acts or Omissions*

Mother offered no excuses for the conditions that existed in her home at the time the children were removed. Mother refuted that she has ever taken drugs and could not explain how she tested positive for cocaine, other than stating that she may have been around "negative people." She agreed that she allowed Father back into

her life because she believed that he had changed. She most recently stated that she is done with Father.

Our review of the *Holley* and statutory factors above shows some evidence that termination was in the children's best interest. Mother allowed the children to live in dirty and possibly dangerous conditions prior to DFPS's intervention. She, admittedly, hid from DFPS, used synthetic marijuana, and failed two drug tests for cocaine during the pendency of the termination proceedings. She also took the children from Grandmother for unsupervised visitation in violation of a court order. *See In the Interest of E.C.A. and A.A.G.*, 2017 WL 6759198, at *4. The evidence also shows that Mother took the children to visit Father at jail and has allowed Father back into her life, despite Father's long criminal record, drug use, and his propensity to commit domestic violence.

Texas courts recognize as a paramount consideration in the best-interest determination the children's need for permanence through the establishment of a "stable, permanent home." *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). The children are currently in a safe, stable, and potentially permanent home with their foster parents. *See In re A.R.G.*, 2019 WL 1716262, at *10. The evidence also shows that the foster parents intend to adopt all of Mother's children. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) ("Evidence about placement plans and adoption are, of course, relevant to best interest."). Despite evidence showing that

23

Mother has maintained a stable job and a home, the totality of the evidence is such that a reasonable factfinder could form a firm conviction or belief that termination of Mother's parental rights is in her children's best interest. *See In re J.F.C.*, 96 S.W.3d at 266; *In re A.R.G.*, 14-18-00952-CV, 2019 WL 1716262, at *10 (Tex. App.—Houston [14th Dist.] April 18, 2019, no pet.). Thus, we conclude that the evidence is legally and factually sufficient to support the trial court's best-interest finding.

We overrule Mother's sole issue on appeal.

## Conclusion

We affirm the judgment of the trial court.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Hightower.